**D. R. KINCAID, LTD., and Thomas A. Giuli, doing business as Kincaid-Giuli Joint Venture, Libelants,**

v.

**TRANS–PACIFIC TOWING, INC., Broker's Inc., and Clarence C. T. Loo, Respondents.**

**No. 494.**

United States District Court
D. Hawaii.
Oct. 19, 1965.

---

Hoddick, Rothwell & Chang, by Robert M. Rothwell, Honolulu, Hawaii, for libelants.

Frank D. Gibson, Jr., Honolulu, Hawaii for Clarence C. T. Loo.

TAVARES, District Judge.

Libelants contracted with respondent Trans-Pacific Towing, Inc. to furnish a tug and barge to carry a cargo from Kure Island to Honolulu.

While respondent's barge was beached on Kure loading cargo, respondent's tug was sunk while attempting to move from one anchorage to another.

Libelants allege that the loss of Trans-Pacific's tug resulted from the negligence of its captain, and they specify various damages resulting from Trans-Pacific's consequent failure to complete the towing contract.

Trans-Pacific denies negligence of its tug captain, and further pleads exculpation by virtue of the following provision in paragraph 13 of the towing contract:

"*neither Trans Pacific nor the vessels shall be responsible for loss or damage sustained by Kincaid due to the failure* or refusal *of Trans Pacific to perform or complete the performance* of any transportation service herein provided for, *if arising or resulting from loss of* or damage to *the vessels, or either of them,* or arising or resulting in whole or in part from any other cause beyond the control of Trans Pacific, or if in the option of Trans Pacific, or in the opinion of the master of the tug, to perform or complete the performance of the transportation service would result in loss or damage to the cargo or the vessels, or either of them." (emphasis added).

Libelants claim that paragraph 13 does not excuse Trans-Pacific from performing the towing contract, contending that:

(a) Impossibility is no defense because Trans-Pacific could have chartered another tug to return the loaded barge to Honolulu;

(b) Trans-Pacific cannot show that the loss of its tug was the result of causes beyond its control;

(c) That if paragraph 13 is construed to relieve Trans-Pacific of the consequences of its own negligence, that it is void as against public policy; and

(d) That paragraph 15 of the contract incorporates the Harter Act by reference, and thus Trans-Pacific could not exculpate itself from failure to exercise due diligence to make the vessel in all respects seaworthy, and properly manned, equipped and supplied.

But libelants' theories are all predicated on a finding that Trans-Pacific was negligent, and since this Court finds that libelants have failed to prove by a preponderance of the evidence that the loss of the tug was proximately caused by Trans-Pacific's negligence, libelants cannot recover here.

On April 21, 1961, Trans-Pacific's tug (the "Port of Bandon") and barge (the "Barge 30") arrived at Kure atoll; the tug released the barge to a launch which towed the barge across the lagoon to the shore where it was secured and beached. While the barge was loading, the tug lay off Kure atoll moored to a Coast Guard buoy about one-half mile off shore until April 22, 1961, when a Coast Guard tanker arrived and needed the buoy. The tug cut loose from the buoy and anchored about 1200 yards west of the buoy and approximately 450 yards south of the barrier reef. The depth of the water there was between 60 and 65 feet. The tug was on the lee side of the island, protected from the wind, until about noon on April 24, 1961, when the wind got stronger and shifted so that, in order to avoid any danger of being blown ashore, the Captain, Wayne Locey, decided to raise anchor and move. While the anchor was being raised, the tug came on something solid and began to leak. The tug leaked so fast that the pumps were unable to keep up with the incoming water. In order to avoid the tug's sinking in deep water and to avoid danger to the crew, the Captain ran the tug at high speed into the lagoon and ashore, resulting in its becoming a total loss.

Although libelants introduced evidence tending to show negligence on the part of the tug captain with respect to the place and manner in which he anchored his vessel, the Court is not persuaded that libelants have proved negligence by a preponderance of the evidence. First, there is no exact evidence as to the true location of the tug at the time it struck; every attempt at location was based on estimates made some time after the accident, at places not near the scene of the accident, and hence based on the somewhat unreliable recollection of each witness as to the appearance of the scene of the accident. No actual measurement or attempt to locate the scene of the accident on the site was made, probably due to the great distance of Kure Island from Honolulu. Couple this with the margin of error that results from trying to locate an object as small as this little tug on a map with the scale of the maps in evidence (approximately 556 yards or 1668 feet to the inch) and the possibilities of error are greatly magnified.

Although two expert witnesses for the libelants testified—in answer to hypothetical questions based on testimony in the case—that in their opinion there was lack of prudent seamanship on the part of the tug captain, the Court is not persuaded that his anchoring at the place he did, with a vessel as small as his, and with a draft of only eight feet, can be considered negligence. This man was apparently a highly qualified tug master with experience in many different conditions along the West Coast of the United States up to Alaska, and even though his experience did not include towing in tropical areas such as Hawaii and Kure, the Court believes he was a competent tug master. Even the Coast Guard buoy to which the tug was first moored, and which appears to have been tacitly accepted as a proper place to anchor, was only in 60 feet of water, with coral heads on the bottom; when the tug was forced to leave the buoy, it again anchored in approximately 60 feet of water which would appear to have been reasonably safe even with coral heads, considering that the tug had only an eight foot draft. On the whole, neg-

ligence can only be found by adopting the inferences most unfavorable to respondent from evidence and circumstances from which inferences favorable to respondent can just as reasonably be drawn.

There is no reliable or persuasive evidence that the tug dragged its anchor; no reliable or persuasive evidence that it actually hit the reef; in fact, no clear evidence that it even hit a coral head, although that seems to be a strong probability.

It is true that Captain Locey seemed to exhibit a strange lack of memory on many details, but this does not prove that he was untruthful. However unusual it might appear that he would not remember details about what he said was the worst catastrophe in his life, it is possible that he actually was as forgetful as he appeared to be.

Furthermore, the Court received the definite impression that Captain Locey had not really made adequate preparation for his testimony. For example, he was mistaken about the date on which certain photographs were taken, when the date was recorded on the back of each photo. The apparent lack of pretrial preparation of this witness may be due in part to the fact that after Trans-Pacific's tug sank, and before the commencement of this action, Trans-Pacific sold Barge 30 to respondent C. T. Loo, who also contracted to assume the liability, if any, of Trans-Pacific to libelants. Thus Captain Locey was never an employee of Mr. Loo, who is the real respondent here, and presumably neither Trans-Pacific nor Captain Locey had any particular interest in this case that would cause them to make careful preparation for the latter's testimony. Nor does the record indicate that depositions were taken of this witness, which could have helped to sharpen his memory before trial.

The Court believes that Captain Locey was an honest witness, notwithstanding his apparently poor memory and apparent lack of preparation for this trial.

Assuming, for the purpose of discussion, and without inferring it to be true, that Captain Locey was negligent in anchoring where he did on April 22, 1961, such assumed negligence would have related only to the danger of the tug's being blown on the reef. But the evidence strongly indicates that the tug was not blown onto the reef. Although the evidence does not disclose exactly what solid object was encountered by the tug, most probably it was a coral head. It does not appear that the danger of striking a coral head was any greater in the place Captain Locey chose to anchor, than, for example, in the area of the Coast Guard buoy, which appears to be assumed by all parties to have been a reasonably safe anchorage.

There is no evidence that anyone knew, or advised the Captain, that there was any special danger from coral heads that could put a hole in a tug, in the area where he anchored. His uncontradicted testimony was that the depth in that area was approximately 60 feet.

■ The Court must therefore hold that negligence on the part of Captain Locey as a proximate cause of the loss of the tug has not been proved by a preponderance of the evidence. In the absence of a finding of negligence, libelants' theories collapse, and judgment must be rendered for respondents.

■ On the other hand, this Court finds that it would be inequitable for the respondent to recover for layover time for the barge, when it was unable or unwilling to complete the voyage. The Court believes and finds that, when Trans-Pacific decided to take advantage of its right to terminate the contract by reason of the loss of its tug, it abandoned its right to layover time. Judgment will be rendered in favor of the libelants and against the respondents on the counterclaim.

Each party shall pay its own costs.

The foregoing will constitute the Court's findings of fact and conclusions of law.